## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATE OF NEW JERSEY, ex rel. ELIZABETH NEGRON**<br><br>                    **Plaintiffs,**<br><br>        **v.**<br><br>**PROGRESSIVE CASUALTY INSURANCE COMPANY**<br>          **and**<br>**PROGRESSIVE GARDEN STATE INSURANCE COMPANY**<br><br>                    **Defendants.** | **UNDER SEAL AND IN CAMERA**<br><br>**CIVIL ACTION NO.**<br><br>RECEIVED<br><br>JAN 2 8 2014<br><br>AT 8:30_____M<br>WILLIAM T. WALSH<br>CLERK |

## COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACT

### I.    INTRODUCTION

1.    Qui Tam Relator Elizabeth Negron brings this action on behalf of the United States of America and the State of New Jersey to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the New Jersey False Claims Act, N.J.S. 2A:32C-1, *et seq.*, against Defendants, Progressive Casualty Insurance Company and Progressive Garden State Insurance Company.

2.    Relator's allegations against Defendants relate to an illegal scheme by which they exploited New Jersey auto insurance law to avoid paying medical benefits to motor vehicle accident victims by causing healthcare providers to submit false and fraudulent claims to Medicare and Medicaid.

### II.    THE PARTIES

3.    Relator Elizabeth Negron (hereinafter "Relator") is a resident of New Jersey and a citizen of the United States.

1

4.     At all times material hereto, Relator was a Medicare beneficiary.

5.     Defendant, Progressive Casualty Insurance Company, is an Ohio corporation with a principal place of business located at 6300 Wilson Mills Road, Cleveland, OH 44143.

6.     Defendant, Progressive Casualty Insurance Company is one of the largest insurance carriers in the United States, with over 10 million insurance policies in force.

7.     Defendant, Progressive Garden State Insurance Company, is an Ohio corporation with a principal place of business located at 6300 Wilson Mills Road, Cleveland, OH 44143.

8.     Defendant, Progressive Garden State Insurance Company, is a subsidiary of co-Defendant, Progressive Casualty Insurance Company.

9.     Defendant, Progressive Garden State Insurance Company, is licensed by New Jersey's Department of Banking and Insurance to write auto insurance policies in the State of New Jersey.

10.     Defendants, Progressive Casualty Insurance Company and Progressive Garden State Insurance Company, have permanent, continuous and regular contacts with the State of New Jersey.

## III.   JURISDICTION AND VENUE

11.     This action arises under the law of the United States to redress violations of the federal False Claims Act (hereinafter "FCA"), 31 U.S.C. § 3729, *et seq.*

12.     Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

13.     The Court has jurisdiction over Defendants' violations of the New Jersey False Claims Act (hereinafter "NJFCA"), N.J.S. 2A:32C-1, *et seq.*, because their violations of New Jersey law and their violations of federal law arise from the same transactions, occurrences and scheme. The Court also has pendant jurisdiction over Defendants' New Jersey law violations because these violations and Defendants' violations of federal law arise out of a common nucleus of operative

facts. In addition, a civil action for violation of the New Jersey False Claims Act may be brought in state or federal court pursuant to N.J.S. 2A:32C-5.a.

14.     The Court has personal jurisdiction over Defendants by and through Defendants' permanent, continuous and regular contacts with the State of New Jersey.

15.     Defendants are permitted and licensed by the State of New Jersey to sell auto insurance policies to residents of New Jersey. Consequently, Defendants are subject to the jurisdiction of this Court.

16.     Defendants regularly and continuously solicit and sell auto insurance to New Jersey residents. Therefore, Defendants are subject to the jurisdiction of this Court.

17.     Defendants have caused to be submitted claims for payment to federal and state health insurance programs, including Medicare and Medicaid. Accordingly, Defendants are subject to the jurisdiction of this Court.

18.     Venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district.

19.     The facts and circumstances of Defendants' violations of the federal FCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit investigation or in the news media.

20.     The facts and circumstances of Defendants' violations of the NJFCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit investigation or in the news media.

21.     Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the federal FCA, and she provided disclosures of the allegations of this Complaint to the United States prior to filing.

22.     Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the NJFCA. Prior to filing, she voluntarily provided the information on which the allegations in this Complaint are based to the State of New Jersey.

23.     Immediately upon the filing of this Complaint, Relator will provide the New Jersey Attorney General with a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses.

## IV.     APPLICABLE LAW

### A.     Background on Federal and State-Funded Health Insurance Programs

24.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program.

25.     Medicare provides health insurance to people age 65 or older, people under 65 with certain disabilities and people of all ages with end-stage renal disease.

26.     Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions.

27.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

28.     Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

29.    Under Medicare Part A, contractors serve as "fiscal intermediaries," administering

Medicare in accordance with rules developed by the Health Care Financing Administration, now

known as the CMS.

30.    Under Medicare Part B, the federal government contracts with insurance companies and

other organizations known as "carriers" to handle payment for physicians' services in specific

geographic areas. These private insurance companies, or "Medicare Carriers," are charged with

and responsible for accepting Medicare claims, determining coverage and making payments

from the Medicare Trust Fund.

31.    The principal function of both intermediaries and carries is to make and audit payments

for Medicare services to assure that federal funds are spent properly.

32.    To participate in Medicare, providers must assure that their services are provided

economically and are medically necessary. Medicare will reimburse costs for medical services

that are needed for the prevention, diagnosis or treatment of a specific illness or injury.

33.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added

to the Social Security Act.

34.    Medicaid aids the states in furnishing medical assistance to eligible, needy persons,

including indigent and disabled persons.

35.    Medicaid is the largest source of funding for medical and health-related services for

America's poorest people.

36.    Medicaid is a cooperative federal-state public assistance program that is administered by

the states.

37.    The New Jersey Medical Assistance and Health Services Program (New Jersey

Medicaid) is administered by the New Jersey Department of Human Services ("NJDHS"), and,

specifically, by the Division of Medical Assistance and Health Services ("DMAHS"). DMAHS
is an agency of NJDHS.

38.     Funding for Medicaid is shared between the federal government and those state
governments that choose to participate in the program.

39.     Title XIX of the Social Security Act allows considerable flexibility within each State's
Medicaid plan and, therefore, specific Medicaid coverage and eligibility guidelines vary from
state to state.

40.     However, in order to receive federal matching funds, a state Medicaid program must
meet certain minimum coverage and eligibility standards.

**B.     New Jersey Auto Insurance Law**

41.     In 1972, the New Jersey Legislature enacted the New Jersey Automobile Reparation
Reform Act, commonly referred to as the "No Fault" law or act. N.J.S. 39:6A-1, *et seq.*

42.     Under the 1972 statute, all insurance policies written for private passenger vehicles were
required to provide enumerated personal injury protection ("PIP") benefits to certain classes of
persons without regard to who was at fault for causing the motor vehicle accident. Id.

43.     PIP benefits, which include medical benefits, are used to pay medical and other related
expenses incurred by the insured as the result of a motor vehicle accident.

44.     In 1990, the New Jersey Legislature enacted the Fair Insurance Reform Act. 1990 N.J.
ALS 8.

45.     The Fair Insurance Reform Act of 1990 requires insurers to provide an option for
insureds to have their health insurance, including insurance from a federal or state program, be
primarily responsible for payment of PIP-like benefits. N.J.S. 39:6A-4.2 and 39:6A-4.3. This
option is often referred to as the "health first option." In order to avoid coverage disputes,

6

N.J.A.C. 11:3-14.5(b) requires written information identifying the health insurer providing primary PIP medical expense benefits.

46.     When the insured chooses this option, an insurance company like Progressive is only secondarily liable for medical expenses under the terms of the insurance contract.

47.     Pursuant to the statutory language and guidelines provided by New Jersey's Department of Banking and Insurance, an insured can choose to have virtually any health insurance carrier be primary payer of PIP benefits, including federal or state programs, but not Medicare or Medicaid. N.J.A.C. 11:3-14.5(a).

**C.     Medicare Secondary Payer Law**

48.     In certain cases, an individual who is eligible for Medicare coverage also has coverage through an auto insurance policy providing no-fault medical benefits.

49.     Congress endeavored to coordinate payment in situations in which an individual has overlapping Medicare benefits and private insurance coverage by enacting the Medicare Secondary Payer ("MSP") statute in 1980. 42 U.S.C. § 1395y, *et seq.*

50.     The MSP statute and related regulations dictate when Medicare will pay a medical claim as the "primary payer" and when Medicare will pay as a "secondary payer." Generally, under the MSP statute and related regulations, the private insurance carrier is always the primary payer. *See*, *e.g.*, 42 U.S.C. § 1395y(b)(1)(A),(B); 42 C.F.R. §§ 411.172, 411.101, 411.203.

51.     The CMS has provided guidelines on when Medicare will pay medical benefits when no-fault auto insurance coverage is also available.

52.     The CMS has promulgated the following guideline: " Under § 1862(b)(2) of the Act, 42 U.S.C. 1395y(b)(1), Medicare does not make payment for covered items or services to the extent that payment has been made, or can be reasonably be expected to be made under no-fault

insurance. Medicare is secondary to no-fault insurance even if State law or a private contract of insurance stipulates that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries…" *Medicare Secondary Payer (MSP) Manual*, Chapter 2 – MSP Provisions, Section 60 – No-Fault Insurance (Rev. 49, Issued: April 07, 2006; Effective/Implementation: May 08, 2006).

53.     Medicare is liable for claims stemming from a motor vehicle accident *only* when the no-fault insurance coverage, such as PIP, has exhausted.

**D.     Medicaid Secondary Payer Law**

54.     Just like Medicare, Medicaid is generally considered the payer of last resort. 42 C.F.R. § 433.135, *et seq.*

55.     Section 433 of Title 42 regulates State fiscal activities with respect to state-ran Medicaid programs. 42 C.F.R. § 433.1.

56.     Subpart D ("Third Party Liability") concerns the liability of third parties, such as commercial insurance companies, with respect to claims submitted to a Medicaid program for payment. 42 C.F.R. § 433.135, *et seq.*

57.     Similar to the MSP statute, federal regulation ensures that Medicaid is secondary to other available sources of insurance benefits, including no-fault auto insurance benefits like PIP. 42 C.F.R. § 433.139.

**E.     New Jersey Secondary Payer Law**

58.     New Jersey's "health first option" was enacted ten years after the MSP statute and 42 C.F.R. § 433. Not surprisingly, the statute considers the secondary status of Medicare and Medicaid. The statute expressly provides, "this option shall not apply to any coverage or benefits provided pursuant to Medicare or Medicaid." N.J.A.C. 11:3-14.5(a).

8

59.     Pursuant to the statute's language, it is illegal under New Jersey law to bill Medicare and Medicaid as primary under the terms of an auto insurance policy. N.J.A.C. 11:3-14.5(a).

60.     New Jersey's Department of Insurance has advised that an insured "cannot select Medicare or Medicaid as your primary health insurer for auto accidents."

**F.      The Federal False Claims Act**

61.     The FCA provides for liability for treble damages and a penalty from $5,500 to $11,000 per claim for anyone who knowingly submit*s* or *causes the submission* of a false or fraudulent claim to the United States.

62.     The FCA extends civil liability to any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim or fraudulent claim paid or approved by the government; (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid. 31 U.S.C.S. § 3729(a).

63.     To establish a prima facie case under 31 U.S.C.S. § 3729(a)(l) of the FCA, the United States must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. Under the FCA, 31 U.S.C.S. § 3729 *et seq.*, a claim includes any request or demand for money from the United States government. 31 U.S.C.S. § 3729(c).

64.     In the context of the FCA, the term "knowingly" is defined as follows: "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C.S. § 3729(b).

65.     The Supreme Court has held that the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the government and reaches beyond "claims" that might be legally enforced, to all fraudulent attempts to cause the government to pay out sums of money and, therefore, the term "false or fraudulent claim" should be construed broadly. United States v. Neifert-White Co., 390 U.S. 228, 232-33 (1968).

66.     Although the archetypal *qui tam* action is filed by an insider at a private company who discovers his employer has overcharged under a government contract, courts have been willing to entertain FCA actions under numerous alternative theories. United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996).

67.     The Third Circuit has also recognized FCA liability in cases in which a "defendant causes, or will cause, [an] intermediary to make a false claim against the government resulting in a financial loss to the treasury." Hutchins, 253 F.3d at 185; *see, e.g.*, United States v. Bornstein, 423 U.S. 303, 309, 96 S. Ct. 523, 46 L. Ed. 2d 514 (1976).

68.     The United States District Court for the Eastern District of Pennsylvania has already addressed FCA liability under the MSP in United States ex rel. Drescher v. Highmark, Inc., 305 F. Supp. 2d 451 (E.D. Pa. 2004). In denying the defendant's 12(b)(6) motion to dismiss, the District Court held that FCA liability may be triggered when a private insurance company causes a medical provider to a submit a claim to Medicare as the purported primary payer. Id. at 461.

**G.     New Jersey's False Claims Act**

69.     The NJFCA was enacted in 2008 and became effective on March 13, 2008.

70.     The NJFCA is modeled after the federal FCA.

71.    The NJFCA provides, in pertinent part: (a) a person who (1) knowingly presents or

causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee,

or other recipient of State funds, a false or fraudulent claim for payment or approval; (2)

knowingly makes, uses, or causes to be made or used a false record or statement to get a false or

fraudulent claim paid or approved by the State; or (3) conspires to defraud the State by getting a

false or fraudulent claim allowed or paid by the State; is jointly and severally liable to the State

for a civil penalty of not less than and not more than the civil penalty allowed under the federal

FCA. NJFCA § 2A:32C-3.a, *et seq*.

72.    Under the NJFCA, the term "knowingly" is defined as follows: "knowing" and

"knowingly" mean that a person, with respect to information: (1) has actual knowledge of the

information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

in reckless disregard of the truth or falsity of the information, and no proof of specific intent to

defraud is required. NJFCA § 2A:32C-2.

73.    Equal to the FCA, the NJFCA provides for liability for treble damages and a penalty from

$5,500 to $11,000 per claim for anyone who knowingly submit*s* or *causes the submission* of a

false or fraudulent claim to the United States.

**V.    FACTS**

**A.    Progressive's Online Application**

74.    Defendants' have an online application for auto insurance on their website,

www.progressive.com.

75.    Defendants' online application requires the applicant to enter personal information then

recommends a policy based on the information entered.

76.     During the application process, the applicant is asked whether all members of his or her household are covered by health insurance and whether that health insurance covers injuries in the event of an accident.

77.     If the applicant selects "Yes" for each of these inquiries, Progressive automatically recommends a policy in which the health insurance carrier is deemed primary payer of PIP benefits, including medical benefits.

78.     On the page that outlines the aforesaid recommended policy, there is a section for "PIP (Personal Injury Protection) Policy Coverages."

79.     Within the aforementioned section, it reads "No" next to "PIP Primary Insurer," thereby attempting to indicate that Progressive will be secondarily liable for PIP benefits, including medical benefits.

80.     Next to "PIP Primary Insurer" is a "?" within a box.

81.     Only when the applicant clicks on the "?" does Progressive offer an explanation for this coverage selection.

82.     Moreover, if, and only if, the applicant clicks on the "?," is the applicant instructed to select "Yes" if… "one or more of the drivers on the policy are on MEDICARE or MEDICAID…"

83.     Even though Defendants' online application automatically enrolls applicants into the "health first option," the application never inquires into the applicant's Medicare or Medicaid status.

84.     Accordingly, Medicare and Medicaid beneficiaries are automatically recommended auto insurance policies with the "health first option" and are subsequently enrolled into such policies.

85.     Defendants could prevent Medicare and Medicaid beneficiaries from being enrolled into the "health first option" by simply asking the applicant whether he or she is a Medicare or Medicaid beneficiary. Likewise, Defendants could ensure that state and federal law is not violated by automatically enrolling applicants into an auto insurance plan where PIP is primary.

86.     Rather, Defendants' online application leaves it up to the prospective policy member to manually opt out of the "health first option" if he or she is a Medicare or Medicaid beneficiary.

87.     Upon information and belief, the online application process provides Defendants no information as to an applicant's health insurance carrier.

**B.     Relator's Motor Vehicle Accident and Resulting False and Fraudulent Claims**

88.     At all times material hereto, Relator was the owner of a 1994 Chevrolet G20 Van that was registered in New Jersey.

89.     Relator purchased an auto insurance policy from Defendants through the aforementioned online application process.

90.     At all times material hereto, Relator was a Medicare beneficiary due to a disability.

91.     For reasons previously described, Relator was automatically recommended an auto insurance policy with the "health first option" and subsequently enrolled into such a policy despite being a Medicare beneficiary.

92.     Defendants never inquired into Relator's Medicare status during the application process.

93.     Relying on the information and recommendations provided by Defendants, Relator never clicked on the "?" to get more information about the "PIP Primary Insurer" coverage option.

94.     Since Relator did not manually opt out of the "health first option," she was told she would receive a discount on her premiums.

95. Thereafter, Relator was insured by Defendants who assigned her a policy with number 50797095-0.

96. On May 14, 2010, Relator was involved in a motor vehicle accident in Philadelphia, Pennsylvania.

97. After the accident, Relator received medical treatment from the following healthcare providers: Diagnostic Imaging, Inc., Oxford Health Care, P.C., Aria Health System and the City of Philadelphia EMS Division.

98. As is customary with motor vehicle accident victims, these healthcare providers submitted their bills to Relator's auto insurer (Defendants) for payment.

99. Defendants received the aforementioned bills and assigned them claim number 103118594.

100. The aforementioned medical bills were processed by a Progressive adjuster.

101. Pursuant to Progressive's claims processing procedures, the adjuster denied the bills recognizing that Relator was enrolled in the "health first option."

102. The adjuster then sent denial letters to Relator and the healthcare providers.

103. The letter explained that Relator was ineligible for PIP benefits under her policy because she "elected to have [your] health insurance as the primary source of coverage for medical costs."

104. The letter further instructed, "[A]ll medical bills related to the above captioned loss should be submitted to [your] health insurance carrier for payment."

105. Accordingly, Diagnostic Imaging, Inc. was caused to submit their bills to Medicare.

106.    Upon information and belief, the CMS contractor for Medicare recognized that there was possible no-fault insurance available and, therefore, denied Diagnostic Imaging, Inc.'s first submission on or about January 18, 2011.

107.    Diagnostic Imaging, Inc. resubmitted its bills to Medicare, despite their being no-fault insurance available from Defendants, and Medicare paid the false and fraudulent claims on or about February 08, 2011.

108.    After receiving Defendants' letter, Oxford Healthcare contacted Progressive and advised the adjuster that it was not an approved Medicare provider. The adjuster requested a letter from Oxford indicating that it did not participate in Medicare before Defendants finally paid some of the bills.

109.    After receiving Defendants' letter, Aria Health System attempted to reach out to Relator in order to obtain her health insurance information. By the time Aria's billing department figured out that Relator was a Medicare beneficiary, it had missed the Medicare submission deadline. Accordingly, Aria simply wrote off the bills as a loss.

110.    After receiving Defendants' letter, the City of Philadelphia billed Medicare for its ambulatory services. However, the City missed the Medicare submission deadline and the CMS contractor denied the claims as untimely.

111.    When all of the aforementioned claims were submitted to Medicare, there were still medical benefits available under Relator's auto insurance policy with Defendants.

112.    Defendants had actual knowledge of Relator's Medicare status after its adjuster's conversation with Oxford Healthcare, if not sooner.

113.   Prior to obtaining actual knowledge of Relator's Medicare status, Defendants deliberately ignored Relator's Medicare status and acted with reckless disregard as to the identity of Relator's health insurance carrier.

114.   After discussing Relator's Medicare status with Oxford Healthcare and Relator, Defendants knew their denial letter and actions were causing Relator's healthcare providers to submit bills to Medicare even though the PIP benefits had not exhausted.

115.   Prior to obtaining knowledge of Relator's Medicare status, Defendants deliberate ignorance of Relator's Medicare status and their reckless disregard as to the identity of Relator's health insurance carrier caused Relator's healthcare providers to submit false and fraudulent claims to Medicare.

## VI.   **COUNTS**

### COUNT I (ALL DEFENDANTS) – VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, *et seq.*

116.   Relator re-alleges paragraphs 1-112 as if set forth in full herein.

117.   Defendants automatically recommend and subsequently enroll applicants into auto insurance policies that treat the health insurance carrier as primary payer of medical expenses, irrespective of whether that applicant is a Medicare beneficiary.

118.   When the Medicare beneficiary is involved in a motor vehicle accident, his or her respective healthcare providers submit claims to Defendants for payment under the auto insurance policy.

117.   Defendants instruct their adjusters to check whether the insured is enrolled in a policy with the "health first option."

118.   If the policy provides that the health insurance carrier is primary payer of PIP under the policy, the adjuster then sends denial letters to the insured and the insured's healthcare providers.

118.   Within that letter, the adjuster instructs the aforementioned parties to submit the medical bills to the insured's health insurance carrier because the auto insurance is secondary under the terms of the policy.

119.   Defendants: (1) know that the health insurance carrier is Medicare and disregard this fact; (2) deliberately avoid checking to see if the insurance carrier is Medicare; or (3) act with reckless disregard as to the identity of the health insurance carrier.

120.   Defendants' actions and claims processing procedures cause the healthcare providers to submit false and fraudulent claims to Medicare.

121.   By submitting claims to Medicare, the healthcare providers are certifying their compliance with all applicable Medicare law including the Medicare Secondary Payer Statute.

122.   The healthcare providers, acting under instruction of Defendants, are violating the Medicare Secondary Payer Statute because they are submitting claims to Medicare when there are no-fault insurance benefits available. Therefore, these claims are false and fraudulent.

123.   By submitting the claims to Medicare, despite there being no-fault insurance benefits available, the healthcare providers: (1) know they are submitting false and fraudulent claims under the Medicare Secondary Payer Statute; (2) are deliberately ignoring the falsity of the claims under the Medicare Secondary Payer Statute; and (3) are acting with

reckless disregard as to the falsity of the claims under the Medicare Secondary Payer Statute.

124. Defendants' egregious and fraudulent actions are causing the healthcare providers to submit such false and fraudulent claims to Medicare.

125. The New Jersey Legislature created the "health first option" in 1990.

126. Since 1990, Defendants have been illegally enrolling Medicare beneficiaries into auto insurance policies where the health insurance carrier is deemed primary payer of medical expenses.

127. Numerous healthcare providers have submitted millions of claims to Defendants for payment under such auto insurance policies.

128. Defendants systematically deny these claims as the purported secondary payer.

129. Defendants recklessly instruct their policyholders and their healthcare providers to submit their claims to the policyholders' health insurance carrier- Medicare.

130. Through Defendants' fraudulent and reckless practice, Medicare has received millions of false and fraudulent claims since 1990.

131. The mere submission of a claim to Medicare constitutes fraud under the federal False Claims Act.

132. CMS contractors are paying many of these false and fraudulent claims.

133. Defendants could stop healthcare providers from submitting false and fraudulent claims under these circumstances by simply inquiring into an insured's Medicare status during the application process or before instructing the healthcare providers to submit their claims to the health insurance carrier.

134.   Given the scale of Defendants' fraud, and the ease at which it could be prevented, Defendants are purposefully deriving great economic benefit at the cost of taxpayers.

135.   Defendants have saved billions of dollars by leading healthcare providers to think that they are secondarily liable for medical expenses.

136.   Defendants have caused the Medicare Trust Fund to lose billions of dollars by misleading healthcare providers into thinking Defendants are secondarily liable for medical expenses.

**COUNT II (ALL DEFENDANTS) – VIOLATIONS OF NEW JERSEY'S FALSE CLAIMS ACT, 31 U.S.C. § 3729, N.J.S. 2A:32C-1, *et seq.***

137.   Relator re-alleges paragraphs 1-36 as if set forth in full herein.

138.   Defendants automatically recommend and enroll applicants into auto insurance policies that treat the health insurance carrier as primary payer of medical expenses, irrespective of whether that applicant is a Medicaid beneficiary.

139.   When the Medicaid beneficiary is involved in a motor vehicle accident, his or her respective healthcare providers submit claims to Defendants for payment under the auto insurance policy.

140.   Defendants instruct their adjusters to check whether the insured is enrolled in the "health first option."

141.   If the policy provides that the health insurance carrier is primary under the policy, the adjuster then sends denial letters to the insured and healthcare providers.

142.   Within that letter, the adjuster instructs the aforementioned parties to submit the medical bills to the insured's health insurance carrier because the auto insurance is secondary under the terms of the policy.

143. Defendants: (1) know that the health insurance carrier is Medicaid and disregard this fact; (2) deliberately avoid checking to see if the insurance carrier is Medicaid; or (3) act with reckless disregard as to the identity of the health insurance carrier.

144. Defendants' actions and claims processing procedures cause the healthcare providers to submit false and fraudulent claims to Medicaid.

145. By submitting claims to Medicaid, the healthcare providers are certifying their compliance with all applicable Medicaid law including all federal and state regulation regarding Medicaid's secondary payer status.

146. The healthcare providers, acting under instruction of Defendants, are violating the aforementioned state and federal law because they are submitting claims to Medicaid when there are no-fault insurance benefits available. Therefore, these claims are false and fraudulent.

147. By submitting the claims to Medicaid, despite there being no-fault insurance benefits available, the healthcare providers: (1) know they are submitting false and fraudulent claims under the Medicare Secondary Payer Statute; (2) are deliberately ignoring the falsity of the claims under the Medicare Secondary Payer Statute; and (3) are acting with reckless disregard as to the falsity of the cla ims under the Medicare Secondary Payer Statute.

148. Defendants' egregious and fraudulent actions are causing the healthcare providers to submit such false and fraudulent claims.

149. The New Jersey Legislature created the "health first option" in 1990.

150. Since 1990, Defendants have been enrolling Medicaid beneficiaries into auto insurance policies where the health insurance carrier is deemed primary payer of medical expenses.

151.  Various healthcare providers have submitted millions of claims to Defendants for payment under such auto insurance policies.

152.  Defendants systematically deny these claims as the purported secondary payer.

153.  Defendants recklessly instruct their policyholders and their healthcare providers to submit their claims to the policyholders' health insurance carrier- Medicaid.

154.  Through Defendants' fraudulent and reckless practice, Medicaid has received millions of false and fraudulent claims since 1990.

155.  The mere submission of a claim to Medicaid constitutes fraud under the NJFCA.

156.  The State of New Jersey is paying many of these false and fraudulent claims.

157.  Defendants could stop healthcare providers from submitting false and fraudulent claims under these circumstances by simply inquiring into an insured's Medicaid status during the application process or before instructing the healthcare providers to submit their claims to the health insurance carrier.

158.  Given the scale of fraud, and the ease at which it could be prevented, Defendants are purposefully deriving great economic benefit at the cost of taxpayers.

159.  Defendants have saved billions of dollars by misleading healthcare providers into thinking they are secondarily liable for medical expenses.

160.  Defendants have caused the State of New Jersey to lose billions of dollars by misleading healthcare providers into thinking Defendants are secondarily liable for medical expenses.

## VII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, the United States of America and the State of New Jersey, through Relator, requests the Court enter the following relief:

21

A.  That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729, *et seq.*
    and N.J.S. 2A:32C-1, *et seq.*

B.  That this Court enter judgment against Defendants in an amount equal to three times the
    amount of damages the United States has sustained because of Defendants' actions, plus a
    civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31
    U.S.C. § 3729, *et seq.*

C.  That this Court enter judgment against Defendants in an amount equal to three times the
    amount of damages the State of New Jersey has sustained because of Defendants' actions,
    plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation
    of N.J.S. 2A:32C-1, *et seq.*

D.  That Relator be awarded the maximum amount allowed under the federal FCA and
    NJFCA.

E.  That Relator be awarded all costs of this action, including attorneys' fees and expenses.

F.  That Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

*Jeremy E. Abay*

JEREMY E. ABAY, ESQUIRE
Sacks, Weston, Petrelli, Diamond & Millstein, LLC
1818 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103
(215) 523-6900

Attorney for Relator

Date:   January 28, 2014

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Complaint, along with a copy of Relator's Disclosure Statement, was served upon the following on the date below via Federal Express.

Eric Holder
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

Paul Fishman
Assistant United States Attorney General
District of New Jersey
970 Broad Street, 7th Floor
Newark, NJ 07102

Ellie Honig
Medicaid Fraud Control Unit
Office of the New Jersey Attorney General
P.O. Box 094
Trenton, NJ 08625-0094

SACKS, WESTON, PETRELLI, DIAMOND & MILLSTEIN, LLC

BY: _____
JEREMY E. ABAY, ESQUIRE
1818 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103
(215) 523-6900

Date:   January 28, 2014