**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
_____
ELIZABETH NEGRON,              :
                              :
        Relator/Plaintiff,    :    Civ. No. 14-577(NLH/KMW)
                              :
v.                            :    OPINION
                              :
PROGRESSIVE CASUALTY          :
INSURANCE CO., et al.,        :
                              :
            Defendants.       :
_____
```

**<u>APPEARANCES</u>:**

Jeremy Edward Abay
Sacks Weston Diamond, LLC
1845 Walnut Street
Suite 1600
Philadelphia, PA 19103
     *Counsel for Relator/Plaintiff*

Carl D. Poplar
1010 Kings Highway South
Building Two
Cherry Hill, NJ 08034
     *Counsel for Defendant Progressive Casualty Insurance*
     *Company and Progressive Garden State Insurance Company*

Michael K. Loucks, *pro hac vice*
Kara E. Fay, *pro hac vice*
Skadden, Arps, Slate, Meagher & Flom, LLP
500 Boylston Street
Boston, Massachusetts 02116
     *Counsel for Defendant Progressive Casualty Insurance*
     *Company and Progressive Garden State Insurance Company*

Bernard John Cooney
US Attorney's Office
970 Broad Street
Suite 700
Newark, NJ 07102
     *Counsel for Defendant United States of America as an*
     *Interested Party*

**HILLMAN, District Judge:**

     There are many unique aspects to insurance law.  This case
is no exception as it appears at first glance to be a race
between two powerful parties to determine who gets to come in
second place.

     Relator Elizabeth Negron brings this qui tam action
pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq. and
the False Claims Act of the State of New Jersey, N.J.S.A.
2A:32C-1 et seq.[1]  Relator alleges Defendants Progressive
Casualty Insurance Company and Progressive Garden State
Insurance Company allowed Medicare and Medicaid beneficiaries to
elect a "health first" automobile insurance policy in an online

---

[1]     The Federal False Claims Act prohibits the submission of
false or fraudulent claims for payment to the United States and
authorizes qui tam actions, by which private individuals may
bring a lawsuit on behalf of the Government in exchange for the
right to retain a portion of any resulting damages award.
Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 131
S. Ct. 1885, 1889, 179 L. Ed. 2d 825 (2011); U.S. ex rel.
Wilkins v. United Health Group, Inc., 659 F.3d 295, 298 n.1 (3d
Cir. 2011).

2

application which caused health care providers to submit medical claims to Medicare and Medicaid in violation of secondary payer laws.  Before the Court is a motion to dismiss Relator's complaint pursuant to Fed. R. Civ. P. 12(b)(6) filed by Defendants.  The Court has considered the parties' submissions, and for the reasons that follow, Defendants' motion will be denied.

## I.   BACKGROUND[2]

### A. The Medicare and Medicaid Secondary Payer Act

Prior to 1980, Medicare, a joint federal and state program, generally paid for medical services for beneficiaries regardless of whether the beneficiary was covered by another health plan. Fanning v. United States, 346 F.3d 386, 388 (3d Cir. 2003).  The Medicare Secondary Payer ("MSP") Act was enacted to cut health costs and lower Medicare disbursements by assigning primary responsibility for medical bills of Medicare recipients to private health plans, where such plans exist.  Id. at 388-90. The private plans are thus considered "primary" under the MSP Act and Medicare serves as the secondary payer only when the

---

[2] On January 28, 2014 Relator filed this qui tam action under seal.  On March 11, 2015 the United States declined to intervene and the Court unsealed the complaint on March 17, 2015.  On August 3, 2015, the State of New Jersey declined to intervene.

primary payer does not provide coverage.  Id. at 390.

Congress enacted two provisions to support this goal:

> First, the MSP bars Medicare payments where "payment
> has already been made or can reasonably be expected to
> be made promptly (as determined in accordance with
> regulations)" by a primary plan.  42 U.S.C. §
> 1395y(b)(2)(A) (parenthetical in original).  "Prompt"
> payment is defined in the applicable regulations as
> payment made within 120 days of either the date on
> which care was provided or when the claim was filed
> with the insurer, whichever is earlier.  See 42 C.F.R.
> §§ 411.21, 411.50.  The MSP defines a "primary plan"
> as "a workmen's compensation law or plan, an
> automobile or liability insurance policy or plan
> (including a self-insured plan) or no fault insurance
> [.]"  42 U.S.C. § 1395y(b)(2)(A)(ii) (parenthetical in
> original).  This provision "is intended to keep the
> government from paying a medical bill where it is
> clear an insurance company will pay instead."
> Evanston Hosp. v. Hauck, 1 F.3d 540, 544 (7th
> Cir.1993) (citation omitted).

> Second, the MSP provides that when Medicare makes a
> payment that a primary plan was responsible for, the
> payment is merely conditional and Medicare is entitled
> to reimbursement for it. 42 U.S.C. § 1395(y)(b)(2)(B);
> Blue Cross and Blue Shield of Texas v. Shalala, 995
> F.2d 70, 73 (5th Cir. 1993). Section 1395y(b)(2)(B)
> provides:

> > Any payment under this subchapter with respect to
> > any item or service to which subparagraph (A)
> > applies shall be conditioned on reimbursement to
> > the appropriate Trust Fund established by this
> > subchapter when notice or other information is
> > received that payment for such item or service
> > has been or could be made under such
> > subparagraph.

> 42 U.S.C. § 1395y(b)(2)(B)(i).  Medicare payments are
> subject to reimbursement to the appropriate Medicare
> Trust Fund once the government receives notice that a

4

> third-party payment has been or could be made with
> respect to the same item or service.  <u>Id.</u>

<u>Id.</u> at 839.  In short, Medicare is the secondary payer where a
primary plan exists, including an automobile insurance plan.  42
U.S.C. § 1395y(b)(2)(A)(ii).  Medicare will not pay for any item
or service for which "payment has been made, or can reasonably
be expected to be made" by a primary plan.  <u>Id.</u>  The MSP Act
allows Medicare to conditionally pay medical expenses if the
primary plan does not pay promptly, but is later entitled to
reimbursement if the primary plan is responsible.  42 U.S.C. §
1395y(b)(2)(B)(i)-(ii).

The Federal Medicaid statute also has secondary payer
requirements.  42 U.S.C. §§ 1396k(a)(1), 1396a(a)(25).

**B. New Jersey Insurance Regulations**

Pursuant to N.J.A.C. 11:3-14.5, for policies issued after
January 1, 1991, automobile insurers must give policyholders the
option of using their personal health insurance as the primary
payer of medical bills resulting from a car accident.  The
regulation further states that policyholders who receive health
insurance exclusively through Medicare or Medicaid are
ineligible for this option.  <u>Id.</u>; <u>see also</u> *New Jersey Auto
Insurance Buyer's Guide*, New Jersey Department of Banking and

5

Insurance, *available at* https://www.njm.com/AutoBuyersGuide/
Personal-Injury-Protection.htm ("Cost savings can also be
achieved by using your own health insurance as a primary source
of coverage in the case of injury related to an auto accident .
. . MEDICARE and MEDICAID cannot be used for the Health Care
Primary option."). This appears to be designed to make New
Jersey law consistent with federal law in that under the MSP Act
Medicare and Medicaid can never be the primary payer where
secondary insurance exists.

### C.  Factual Background[3]

While purchasing an auto insurance policy online at
Progressive.com in December 2009, Relator had the choice of

---

[3] On February 25, 2015, Relator filed a putative class action
against Defendants in the Superior Court of New Jersey Law
Division. In that action under the same facts, Relator alleges
violations of the New Jersey Consumer Fraud Act and New Jersey
Truth-in-Consumer Contract, Warranty and Notice Act as well as
fraud and contract claims. On November 5, 2015, the superior
court dismissed Relator's complaint. See Lopez-Negron v.
Progressive Casualty Insurance Company, No. CAM-779-15, slip op.
(N.J. Super. Ct. Nov. 5, 2010). The court found that Relator
had not alleged that Defendants violated any New Jersey statutes
or administrative regulations. Id. at 9. Additionally, the
court found that although Defendants violated N.J.A.C. 11:3-
15.7(a), which requires insurers to obtain coverage selection
forms from policyholders, this violation did not constitute a
per se violation of the Consumer Fraud Act. Id. at 11. The
opinion of the superior court, however, did not analyze or
contemplate purported violations of federal Medicare secondary
payer laws.

selecting a health first policy or a Personal Injury Protection ("PIP") primary insurer policy.  Under a health first policy, a policyholder's private health insurer is responsible for medical bills resulting from an auto accident.  As we have noted and will further explain *infra*, Medicare and Medicaid recipients are not eligible for this type of coverage.  Under the more expensive PIP primary insurer policy, the auto insurer assumes this medical coverage as the primary payer.

The Progressive online application Relator used had a question mark next to each option which explained the coverage.[4] The explanation for the section of "PIP primary insurer" stated:

> What does this cover?
> This option determines whether Progressive Direct will be your **primary** or **secondary** insurer for PIP Medical Coverage.
>
> What does it pay?
> If you select "**Yes**" to the PIP Primary Insurer

---

[4] A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Here, the parties do not dispute the authenticity of Defendants' application, screenshotted and attached as an exhibit to its motion to dismiss.  This application is specifically referenced and quoted in Relator's complaint and may be properly considered on this motion.

question, Progressive Direct will be the primary insurer for your PIP Medical coverage. In the event you are injured in an automobile accident, Progressive Direct, not your health insurer, will be primarily responsible for your medical bills.  You should selected "**Yes**" if:

- One or more drivers listed on the policy are on MEDICARE or MEDICAID
- One or more drivers on the policy are on active military duty
- One or more drivers listed on the policy have no health insurance coverage

If you selected "**No**" to the PIP Primary Insurer question, your health insurer will be the primary insurer for your PIP Medical coverage, and Progressive Direct will be secondary. In the event you are injured in an automobile accident, your health insurer will be primarily responsible for your medical bills.  **Please note that many health insurers will NOT pay medical expenses associate with injuries sustained in an automobile accident.** If you are uncertain about the scope of your health insurance coverage, please check with your health insurer. **Please notify Progressive if your health insurance status changes in the future.**

(Loucks Decl., Ex. A. App. at 13-14 (emphasis in original);

Compl. ¶¶ 81-82.)

Using this online application, Relator selected a health first policy even though she was a Medicare recipient.  On May 14, 2010, while she was covered by this policy, Relator was involved in a motor vehicle accident and incurred medical expenses.  When her health care providers submitted bills to Progressive, Progressive's claims adjuster sent denial letters

8

to Relator's medical providers which explained that Relator had selected a health first policy and instructed that all medical bills should be submitted to her primary health insurer, which for Relator was Medicare.  Two of Relator's four providers allegedly submitted medical bills to Medicare for reimbursement: Diagnostic Imaging, Inc. and City of Philadelphia ambulatory services.[5] Medicare denied one claim as untimely but conditionally paid Diagnostic's claim which was later reimbursed by Progressive.

## II.  JURISDICTION

This Court has jurisdiction over Relator's federal claims under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over Relator's related state law claim under 28 U.S.C. § 1367.

## III. STANDARDS OF LAW

### A.  Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must accept all allegations in the complaint as true and view them in the light most

---

5 It appears two other providers did not submit bills to Medicare, Oxford Healthcare and Aria Health System.

favorable to the plaintiff.  See Evancho v. Fisher, 423 F.3d
347, 350 (3d Cir. 2005).  A complaint must contain "a short and
plain statement of the claim showing that the pleader is
entitled to relief." Fed. R. Civ. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks
"'not whether a plaintiff will ultimately prevail but whether
the claimant is entitled to offer evidence to support the
claims[.]'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8
(2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974));
see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1953
(2009) ("Our decision in Twombly expounded the pleading standard
for 'all civil actions[.]'") (citation omitted).  The Third
Circuit has instructed district courts to conduct a two-part
analysis in deciding a motion to dismiss.  Fowler v. UPMC
Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

First, a district court "must accept all of the complaint's
well-pleaded facts as true, but may disregard any legal
conclusions." Fowler, 578 F.3d at 210-11 (citing Iqbal, 129 S.
Ct. at 1949).  Second, a district court must "determine whether
the facts alleged in the complaint are sufficient to show that
the plaintiff has a 'plausible claim for relief.'" Id. at 211
(quoting Iqbal, 129 S. Ct. at 1950).  "[A] complaint must do

more than allege the plaintiff's entitlement to relief." Id.
"'[W]here the well-pleaded facts do not permit the court to
infer more than the mere possibility of misconduct, the
complaint has alleged – but it has not 'show[n]' – 'that the
pleader is entitled to relief.''" Id. (quoting Iqbal, 129 S.
Ct. at 1949); see also Phillips v. County of Allegheny, 515 F.3d
224, 234 (3d Cir. 2008) ("The Supreme Court's Twombly
formulation of the pleading standard can be summed up thus:
'stating . . . a claim requires a complaint with enough factual
matter (taken as true) to suggest' the required element.  This
'does not impose a probability requirement at the pleading
stage,' but instead 'simply calls for enough facts to raise a
reasonable expectation that discovery will reveal evidence of'
the necessary element.") (quoting Twombly, 550 U.S. at 556).

A court need not credit "bald assertions" or "legal
conclusions" in a complaint when deciding a motion to dismiss.
In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429–
30 (3d Cir. 1997).  The defendant has the burden of
demonstrating that no claim has been presented.  Hedges v.
United States, 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr
Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.
1991)).

**B.    Rule 9(b)**

The Third Circuit has held that "plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b)." U.S. ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 301 n.9 (3d Cir. 2011) (citing U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., 149 F.3d 227, 234 (3d Cir. 1998)). Fed. R. Civ. P. 9(b) states: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." See Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) ("Fed. R. Civ. P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud.").

The Third Circuit made clear, however, that at the pleading stage, Rule 9(b)'s particularity requirement does not require a plaintiff to identify a specific claim for payment to state a claim for relief.  Wilkins, 659 F.3d at 308.  Rather, the Third Circuit suggested that a plaintiff should "identify representative examples of specific false claims that a

12

defendant made to the Government in order to plead an FCA claim properly." Id. (remanding the issue to the District Court). Courts in this District have found that a plaintiff may satisfy that requirement in one of two ways: (1) "by pleading the date, place or time of the fraud;" or (2) using an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." U.S. ex rel. Wilkins v. United Health Group, Inc., No. 08-3425, 2011 WL 6719139, at *2 (D.N.J. Dec. 20, 2011) (on remand from the Third Circuit) (citing Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004)).

In Foglia v. Renal Ventures Management, LLC, 754 F.3d 153, 155-56 (3d Cir. 2014), the Third Circuit explained that the "Fourth, Sixth, Eighth, and Eleventh Circuits have held that a plaintiff must show 'representative samples' of the alleged fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors," while the "First, Fifth, and Ninth Circuits, however, have taken a more nuanced reading of the heightened pleading requirements of Rule 9(b), holding that it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia, 754 F.3d at 155-56

(citations and quotations omitted).  Considering that "the
purpose of Rule 9(b) is to provide defendants with fair notice
of the plaintiffs' claims," the Third Circuit adopted "the more
'nuanced' approach followed by the First, Fifth, and Ninth
Circuits."  Id. at 156-57 (citations and quotations omitted).

Thus, in order to survive a motion to dismiss and satisfy
the standards of Rule 9(b), a plaintiff asserting claims under
the FCA "must provide particular details of a scheme to submit
false claims paired with reliable indicia that lead to a strong
inference that claims were actually submitted."  Id. at 158-59
(citations omitted).  "Describing a mere opportunity for fraud
will not suffice," and, instead, a plaintiff must provide
"sufficient facts to establish a plausible ground for relief."
Id. at 159 (citations omitted).

**IV. DISCUSSION**

**A.   The Federal False Claims Act**

To state a claim under the FCA, a plaintiff must show that:
"(1) the defendant presented or caused to be presented to an
agent of the United States a claim for payment; (2) the claim
was false or fraudulent; and (3) the defendant knew the claim
was false or fraudulent."  Hutchins v. Wilentz, Goldman &
Spitzer, 253 F.3d 176, 182 (3d Cir. 2001).  "The False Claims

14

Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government." Id. at 184.  Accordingly, liability does not attach unless the claim would result in economic loss to the United States government.  Id.

Defendants assert Relator has not sufficiently pled two of the three prongs of an FCA claim: that the claims submitted were false or fraudulent and were submitted knowingly.[6]

### 1.  Prong Two: The Claim was False or Fraudulent

Relator alleges that the claims Defendants caused her health providers to submit to Medicare were false. Specifically, Relator alleges Defendants denied the claims of Relator's health providers (Compl. ¶¶ 101-04) and instructed the health providers to bill her health insurer (Compl. ¶¶ 104, 118), which caused her health providers to submit their bills to Medicare whereby they implicitly certified their compliance with Medicare secondary payer laws (Compl. ¶¶ 115, 120-31). Defendants argue Relator's complaint fails to allege that the

---

[6] For the sake of completeness, the Court finds Relator has sufficiently pled the first prong of an FCA claim, that Defendants presented a claim or caused a claim to be presented by alleging that Defendants "instructed" Relator's medical providers to submit claims to Relator's health insurer. (Compl. ¶ 104.)

claims were false or fraudulent, that Relator's claims could not be conditionally paid by Medicare, or that the claims resulted in a loss to the government.

"There are two categories of false claims under the FCA: a factually false claim and a legally false claim." U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." Id. (citation omitted).

Legally false claims are based on a false certification theory of liability and may be express or implied. Rodriquez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), overruled in part on other grounds by United States ex rel. Eisenstein v. City of New York, 556 U.S. 928 (2009). "Under the 'express false certification' theory, an entity is liable if it falsely certifies that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011)

16

(citing Rodriguez, 552 F.3d at 303).

The implied false certification theory, in contrast, is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." Id. at 305 (citation omitted).  "[U]nder this theory a plaintiff must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." Id. at 307.

Here, Relator alleges her claims under the implied false certification theory - that Defendants caused a claim to be submitted to Medicare which violated the Medicare Secondary Payer Act.  Specifically, Relator alleges Defendants denied Relator's medical bills and instructed Relator's health care providers to bill her health insurer as the primary payer. Relator further alleges that as a result of Defendants' instructions, Relator's health care providers submitted claims to Medicare, implicitly certifying their compliance with Medicare secondary payer laws which were a precondition for payment.  Based on these allegations, the Court finds that Relator has sufficiently pled that Defendants submitted a false

17

claim.

Relator has stated a claim that Defendants violated the Medicare Secondary Payer Act which prohibits payment by Medicare as a primary payer where payment "has been made, or can reasonably expected to be paid [by] . . . an automobile [] insurance plan or policy or under no fault insurance." 42 U.S.C. § 1395y(b)(2)(A). In this case, Medicare was prohibited from acting as the primary payer because other insurance existed.[7] 42 U.S.C. § 1395y(b)(2)(A)(ii); see also *Medicare Secondary Payer (MSP) Manual*, Chapter 2 § 60 (implemented May 8, 2006), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals ("Medicare is secondary to no-fault insurance even if State law or a private contract of insurance stipulates that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries.").

By remaining ignorant of the fact that Relator did not have qualifying health insurance (i.e. a non-Medicare/Medicaid health insurance policy) for a health first policy, Relator's auto insurer caused Realtor's health providers to treat Medicare as

---

[7] Additionally, Relator sufficiently alleged in her complaint that Defendants violated New Jersey auto insurance regulations (see N.J.S.A. 11:3-14.5), which also prohibit Medicare from serving as the primary health insurer of health first policies.

18

the primary payer of Relator's auto-related medical costs. However, Medicare never was, nor by law could it ever be, a primary payer given the existence of Relator's no-fault policy. Stated differently, Defendants caused Realtor's health providers to submit bills to Medicare that Medicare could never be responsible for on a permanent basis.

Importantly here, and also for purposes of intent as we discuss infra, Defendants had at least three opportunities to prevent the sale of health first policies to Medicare and Medicaid enrollees or, even if such sales had occurred, to prevent the submission of claims to Medicare and Medicaid. First, Defendants could have constructed their online application to prevent Medicare and Medicaid enrollees from purchasing health first policies.  This could have been accomplished through pop-up warnings, by requiring applicants to disclose the name of their health insurance carrier or provide a certification that they are not Medicare/Medicaid recipients, or by any number of other modifications to the online application process.

Second, it seems reasonable to assume that the online application process resulted in further post-application underwriting review and further communications between the

Defendants and purchasers of health first policies such as the issuance of a formal policy and declarations, the issuance of permanent insurance cards, premium notices, and renewal processes. Each of these communications or interactions presented a separate opportunity to ensure that health first policies were not held by Medicare/Medicaid enrollees.

Lastly, both sides describe a claims adjustment process which involved a real human being. Yet, nowhere is it explained why the adjustor did not ask the health providers submitting the claims the simple question of what other insurance Realtor presented to the health care provider when the services were rendered. Further, no reason is given why that same simple question was not asked of Realtor at the beginning of the claims adjustment process. Patients of health care providers are routinely asked for proof of insurance and insurance companies routinely ask insureds to provide information about other available and potentially primary or overlapping coverage. Health care providers rarely miss an opportunity to get paid for their services, and as we have noted, insurance companies rarely miss the opportunity to come in second when it comes time to pay.

Indeed, it would seem, whether employer-motivated or not,

that surveying potentially responsible insurance policies and
opining on, or determining, layers of priority is not only a
good business practice but an important part of a claims
adjustor's job description.  To paraphrase a competitor's
television advertisements: "That's what you do."

While the Court agrees that Relator has not pointed to
explicit language in the Medicare Secondary Payer Act which
states, "auto insurers must prevent persons insured by Medicare
from enrolling in health first policies which cause Medicare to
act as the primary payer," the fact that such events apparently
occur and apparently so easily would have the effect if proven
of subverting the entire Medicare Secondary Payer statutory
scheme envisioned by Congress.

Regulated entities such as insurance companies undoubtedly
understand that the purpose of the Medicare (and Medicaid)
Secondary Payer laws is to prohibit those government-funded
programs from acting as the primary payer where other coverage
is available, such as an auto insurance policy.  It makes no
sense, adds unnecessary costs, and increases the risk of
administrative failure, for the claims process to figure that
out at the end rather than the beginning.  Simply put, the
Defendants are asking the Court to ignore the forest for the

21

trees.

The parties dispute the similarity between this case and a Ninth Circuit case, <u>U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.</u>, 398 F. App'x 233 (9th Cir. 2010).  In <u>Mason</u>, the plaintiff, a Medicare beneficiary, was involved in an auto accident and underwent back surgery.  <u>Id.</u>  The plaintiff's primary insurer, State Farm, denied the claim for back surgery because it found the injury was a pre-existing condition and not covered under the policy.  <u>Id.</u> at 235.  As a result, Medicare paid the bill as a secondary payer.  Citing 42 U.S.C. § 1395y(b)(2)(B)(i), the Ninth Circuit found that Medicare had statutorily created liability as a secondary payer because when State Farm denied the claim it did not appear they would make payment within 120 days of the service.  <u>Id.</u>  The court thus found that State Farm could not be liable under the FCA because it had no obligation to reimburse Medicare at the time the claim was submitted.  <u>Id.</u>

The Court agrees with Relator that <u>Mason</u> is distinguishable for two reasons.  First, in <u>Mason</u> there was no dispute that State Farm was the primary payer, while here Relator enrolled in a health first policy whereby Relator's health insurer, Medicare, was to be the primary payer.  Second, State Farm's

basis for denying the claim was a pre-existing condition.  Here, Relator alleges Defendants did not have a legitimate basis for denying the claim and kept deliberately ignorant of their obligation to be primary payers.

Relator argues a more analogous case is U.S. ex rel. Drescher v. Highmark, Inc., 305 F. Supp. 2d 451 (E.D. Pa. 2004). In Highmark, the United States alleged that Highmark, a private insurer, improperly paid MSP claims as the secondary payer when it should have paid them as a primary payer.  Id.  The court found that the United States properly stated a claim because it alleged that Medicare paid claims that should have been paid by Highmark.  Id. at 461.

Similarly, in this case, Relator alleges Medicare improperly paid her medical bills as the primary payer. Defendants argue Highmark is distinguishable because there the plaintiff showed that the insurer knew it was not properly processing MSP claims where here, Defendants did not know of Relator's Medicare status until after the claims were submitted. The theory, or one theory, of Relator's case, however, is that Defendants deliberately remained ignorant of Relator's status in order to "palm off" claims to Medicare.  As in Highmark, Relator alleges that as a result of Defendants' "knowing dereliction of

23

its obligation to pay certain claims or pay as the primary payer, claims that should have been submitted to [Defendants] were ultimately presented to and paid by Medicare." Highmark, 305 F. Supp. 2d at 457[8]; see also U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr., No. 05-572, 2009 WL 499375, at *18 (N.D. Okla. Feb. 27, 2009) ("[Highmark] found that an alleged intentional violation of the MSP regulations stated a claim for relief under the FCA, and the Court agrees with such analysis.").

Additionally, the Court rejects Defendants' arguments that Medicare permissibly paid the claims pursuant to Medicare's conditional payment provision and that the claims did not result in a loss to the government.  The conditional payment provision of the MSP Act permits Medicare to make payment with respect to an item or service if a primary plan "has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations)."  42 U.S.C. § 1395y(b)(2)(B)(i).  The conditional payment provision permits Medicare to make a conditional

---

[8] While the court in Highmark made these findings when analyzing the "false or fraudulent" prong of pleading an FCA claim, the same analysis is likewise helpful under prong three which concerns whether Defendants knew the claim was false.

payment, for example, when coverage is disputed.  <u>See</u>, <u>e.g.</u>, <u>U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.</u>, 398 F. App'x 233 (9th Cir. 2010).  The Court does not believe that Congress intended to carve out an exception that would essentially swallow the rule by permitting Medicare to routinely act as the primary payer to another plan where no genuine coverage dispute exists.  The Court rejects the notion that it was acceptable for Medicare to pay Relator's claim because Defendants eventually reimbursed Medicare.  If that practice regularly occurred, Defendants would essentially be receiving an interest free loan from the government on claims they are obligated to pay and were always obligated to pay.

Further, Relator's complaint specifically alleges that Defendants caused a claim to be submitted to Medicare which it paid, but should not have.  (Compl. ¶ 107.)  This is a sufficient allegation demonstrating economic loss.  <u>Hutchins</u>, 253 F.3d at 184 ("The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government.").  At this stage, Relator has sufficiently alleged that the claims submitted were false or fraudulent.

**B. Prong Three: The Defendant Knew the Claim was False or Fraudulent**

In her complaint, Relator alleges Defendants sold health
first policies to Medicare beneficiaries (Compl. ¶¶ 83, 91),
recklessly disregarded the requirement that they determine if
Medicare insures their policyholders (Compl. ¶¶ 83, 87, 119),
and failed to make reasonable and prudent inquires to ensure
compliance with governing regulations.  Defendants argue that
Relator does not allege Defendants knew her insurer was Medicare
before it denied payment or instructed that the claim be
submitted to her health insurer.

To satisfy the third prong of an FCA claim, Relator must
allege that Defendants knew the claim was false or fraudulent.
The term "knowingly" is defined in the FCA as follows:

> "Knowingly" --(A) mean that a person, with respect to
> information--(i) has actual knowledge of the
> information;(ii) acts in deliberate ignorance of the
> truth or falsity of the information; or(iii) acts in
> reckless disregard of the truth or falsity of the
> information; and (B) require no proof of specific
> intent to defraud.

31 U.S.C.A. § 3729(b)(1).

As explained by another court:

> For a defendant to be liable under the False Claims
> Act, it must have acted knowingly; such knowledge can
> be actual, 31 U.S.C. § 3729(b)(1)(A)(i), or
> constructive, either because it acted in deliberate
> ignorance of the truth, 31 U.S.C. § 3729(b)(1)(A)(ii),
> or in reckless disregard of it, 31 U.S.C. §
> 3729(b)(1)(A)(iii). The "reckless disregard" prong was

26

enacted in a 1986 amendment to the False Claims Act, and what appears to be the only congressional report accompanying that bill states that the obligation is "to make such inquiry as would be reasonable and prudent to conduct under the circumstances.... Only those who act in 'gross negligence' of this duty will be found liable under the False Claims Act." S. Rep. 99–345, at 20, 1986 U.S.C.C.A.N. 5266, 5285. The provision is meant to target that defendant who has "buried his head in the sand" and failed to make some inquiry into the claim's validity. Id. at 21, 1986 U.S.C.C.A.N. at 5286. The inquiry, however, need only be "'reasonable and prudent under the circumstances,' which clearly recognizes a limited duty to inquire as opposed to a burdensome obligation." Id.

U.S. ex rel. Williams v. Renal Care Grp., Inc., 696 F.3d 518, 530 (6th Cir. 2012).

Relator has fulfilled this pleading requirement by alleging that Defendants failed to make reasonable and prudent inquiries to ensure compliance with the MSP Act. Further, Relator alleges it was unreasonable for Defendants' application to permit applicants to select a health first policy, a cheaper option, then fail to ask the applicant to identify their insurer in order to ensure the applicant has the appropriate coverage to be eligible for that policy. (Compl. ¶ 123.) Alternatively, Relator alleges Progressive could have also asked whether the applicant was insured by Medicare or Medicaid, instead of

27

putting this explanation in fine print.[9]  (Compl. ¶ 92.)  As we
note above, this is merely one of several opportunities that
Defendants had to determine whether Relator had qualifying
health insurance.  For these reasons, Relator has sufficiently
alleged Defendants knew the claim was false or fraudulent or
acted in reckless disregard of that knowledge.

### C.  Relator's Compliance with Rule 9(b)

Defendants also argue Relator's complaint is insufficiently
pled under Fed. R. Civ. P. 9(b) because: (1) the complaint does
not have substantiated allegations of a wide-spread scheme and
(2) the complaint improperly lumps two distinct corporate
entities together.  The Court also rejects these arguments.

First, Relator's citation to Defendants' application
questions which purportedly all insurance applicants used online
at the time Relator applied for insurance substantiate her
allegations of a wide-spread scheme.  Second, the Court will not
dismiss Relator's complaint because she has named two
Progressive entities as co-defendants, Progressive Casualty

---

[9] The Court notes that a close look at the fine print of the
Progressive application shows that it instructs that applicants
"should" select Progressive as the insurer if one of more
drivers are insured Medicare and Medicaid.  (Loucks Decl., Ex. A
at 13).  Perhaps more accurate language would be to advise
applicants that they "must" select Progressive as the insurer if
they are insured by Medicare or Medicaid.

Insurance Company and Progressive Garden State Insurance
Company.  While she has pled some evidence that each had some
role in the alleged scheme, Relator claims she does not have
information related to which entity implemented the online
application, sold the health first policies, or denied the
claims.  At this pleading stage, Relator is not required to
allege more specific proofs.  "[R]equiring this sort of detail
at the pleading stage would be 'one small step shy of requiring
production of actual documentation with the complaint, a level
of proof not demanded to win at trial and significantly more
than any federal pleading rule contemplates.'" Foglia, 754 F.3d
at 156 (quoting United States ex rel. Grubbs v. Kanneganti, 565
F.3d 180, 190 (5th Cir. 2009)).  Indeed, "[t]he discovery
process will flush out the [several] entities' individual
conduct, and defendants may make the appropriate motions should
it be determined that any of these entities had no involvement
in the circumstances of plaintiff's claims." United States v.
Medco Health Sys., Inc., No. 12-522, 2014 WL 4798637, at *11
n.12 (D.N.J. Sept. 26, 2014).

     D.   **New Jersey False Claims Act**

     Plaintiff alleges that the State of New Jersey is paying
many of the false claims submitted by Defendants by way of

Medicaid.  (Compl. ¶ 156).  The secondary payer laws which form the gravamen of Relator's complaint applied to Medicaid recipients as well.  42 U.S.C. §§ 1396k(a)(1), 1396a(a)(25). Relator has satisfied <u>Foglia</u> because she has sufficiently alleged the particular details of Defendants' scheme, paired with reliable indicia that lead to a strong inference that claims were actually submitted and paid by the State of New Jersey based on the language of the application and the result it had for Relator as a Medicare recipient.  <u>Foglia</u>, 754 F.3d at 157-58.  For these reasons, Relator's New Jersey False Claims Act claim is also sufficiently pled.

**V.    CONCLUSION**

Defendants' motion to dismiss will be denied. An Order consistent with this Opinion will be entered.


                                        s/ Noel L. Hillman
                                    NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

Dated:      March 1, 2016

30